STATE *ex rel.* KNOX, ATTORNEY-GENERAL, *v.* SUPERIOR OIL Co.*

(In Banc. June 11, 1928. Suggestion of Error Sustained, Former Order Set Aside and Reversed, and Judgment Here for Appellant, Dec. 22, 1928.)

[See 280 U. S. 390, 74 L. Ed. 320.]

[119 So. 360. No. 27247.]

James W. Cassedy, of Brookhaven, and E. C. Sharp, of Booneville, for appellant.

**Jno. L. Heiss,** of Gulfport, and **W. L. Guice,** of Biloxi, for appellee.

**Anderson, J.,** delivered the opinion of the court.

Appellant, the state, on relation of the attorney-general, filed the bill in this case in the chancery court of Harrison county against appellee to recover of the latter gasoline excise taxes alleged to be due appellant by appellee for the period between the 1st day of April, 1926, and the 1st day of November, 1927, under the provisions of chapter 119, Laws of 1926, and the statutes of which that act was amendatory. The case was tried on bill, answer, and proof, resulting in a final decree dismissing appellant's bill. From that decree appellant prosecutes this appeal.

Appellee contended, and the chancellor held, that for the state to impose the excise tax sought to be recovered by the appellant would violate paragraph 3, section 8, article 1, of the Constitution of the United States, which confers on Congress the power to regulate commerce among the several states.

If appellee was due the state any gasoline excise taxes when the bill in this case was filed, it was for gasoline sold by appellee to certain packers of sea food at Biloxi, and by the latter shipped into Louisiana. As to all such gasoline, the appellee contends that the contracts of sale and purchase thereof were part of interstate commerce, and, therefore, under the commerce clause of the Federal Constitution, the state was without power to burden such commerce by imposing excise or privilege taxes thereon. While appellant contends that, under the facts of the case, the contracts for the sale and purchase of such gasoline were no part of, and had no relation whatever to, interstate commerce, and that, therefore, the gasoline sold was taxable under chapter 119, Laws of 1926, and the statutes of which that act was amendatory, as if it had been sold in and had never left this state.

There was no conflict in the evidence as to the controlling facts, which were as follows: Several packers of sea food, doing business in and near Biloxi, bought large

quantities of shrimp and other sea food from fishermen engaged in fishing therefor out in the marshes near Grant's Pass, in the state of Louisiana. It was necessary for these fishermen to be supplied with gasoline and other supplies while they were engaged in making their catch. The packers who bought their catch furnished this gasoline and other necessary supplies, to be paid for when their catch was brought in and purchased by the packers. These packers owned boats which plied between Biloxi and Grant's Pass. They purchased gasoline from appellee and others, and transported it to the fishermen in such boats, which would take the gasoline out into the Louisiana marshes near Grant's Pass, and there deliver it to the fishermen, to whom it was charged by the packers, and, by the fishermen, paid for as stated. On the trial, it was agreed between the parties that the transactions had between appellee and the Gussie Fontaine Packing Company exemplified the manner in which appellee sold and delivered to the packing companies all the gasoline involved in this cause. The Gussie Fontaine Packing Company bought shrimp and, perhaps, other sea food, from fishermen in Louisiana near Grant's Pass. The fishermen needed gasoline, and the packing company would purchase the required amount from appellee on open account to be paid for on the first of the succeeding month. Appellee would then deliver this gasoline in containers on the wharfs at Biloxi to the packing company, where it would be loaded into its own boat and transported to its fishermen. The fishermen came in about every two weeks, and the packing company would then have a settlement with them, in which they would be charged with the gasoline so delivered to them by the packing company, and credited with the amount due them by the packing company for their catch. The boat owned by the Gussie Fontaine Packing Company, the Frank Louis, was not a common carrier of freight, but was used by the packing company alone for its own purposes, principally for transporting supplies, including gasoline,

to its fishermen between Biloxi and Grant's Pass, which boat was registered as a fishing boat. When the Gussie Fontaine Packing Company purchased gasoline from appellee for transportation to Grant's Pass for the purposes named, it executed and delivered to the appellee a receipt or bill of lading as follows:

"No. 4882                     Biloxi, Miss. 12/20, 1927

"Received in good order and condition from Superior Oil Company Biloxi, Miss.

| No. Pieces. | Description of Articles. | Weight. |
| --- | --- | --- |
| 2 drums gasoline | | |

"Consigned to Gussie Fontaine Pkg. Co., destination Grant's Pass, La. By boat Frank Louis, owned or operated by Gussie Fontaine Pkg. Co. The master of said boat, Frank Louis acknowledges receipt of said goods and agrees to deliver merchandise as consigned in like good order and condition.

"It is further understood and agreed that the property consigned herein remains the property of the said Superior Oil Company until it shall be delivered to consignee or consignee's agent at point of destination, but that all due caution and carefulness will be exercised by master and crew of said boat Frank Louis to protect said property and effect a safe delivery without undue delay.

"In consideration of the packet rate charged for carrying property described herein the owners of this boat assume liability for its safe delivery. Should there be damage in loading or unloading, transfers to other vessels or any damages in leakage in transit caused by carelessness or negligence, this damage and loss shall be sustained by owners of boat accepting this shipment.

"366-537          [Signed]          JOSEPH ADAMS,
          "Master of Boat Frank Louis.

"Received $——Collect— to apply in prepayment of packet charges, on property hereon described from

Biloxi, Mississippi, to Grant's Pass, Louisiana.' For Master of Boat.''

Appellee is a corporation located and doing business in Biloxi, Harrison county, Mississippi, selling and distributing gasoline at both wholesale and retail. The Gussie Fontaine Packing Company is also a corporation located and doing business in Harrison county, Mississippi.

It will be seen from what has been stated that the Gussie Fontaine Packing Company purchased its gasoline from appellee to be delivered to it on the wharf at Biloxi, where it was received by the packing company's boat, loaded therein, and transported to Grant's Pass, and there sold to the packing company's fishermen. No freight was paid by either the appellee or the packing company. There was no depot or station at Grant's Pass, or anywhere else in the Louisiana marshes, to which goods shipped could have been consigned. Grant's Pass was merely a touching point for boats, but was not a place of business for the receipt and distribution of freight. There was no common carrier of freight, either by rail or water, between Biloxi and Grant's Pass.

Putting the facts of the case in a short way: Appellee, a corporation of this state, doing business at Biloxi, sold the gasoline involved in this case to various packers of sea food also located and doing business at Biloxi, and charged the purchase price to the packers on open account payable at the end of the succeeding month. Under the contracts of purchase, the appellee delivered the gasoline on the wharfs at Biloxi, where it was loaded by the packers into their own boats, and by such boats transported to the fishermen supplying the packers with sea food for packing purposes. The fishermen were plying their avocation in the Louisiana marshes near Grant's Pass. The packers sent the gasoline out there, and sold and delivered it to their fishermen who paid for it as stated. In other words, the sales and purchases of the gasoline were between parties doing business in this

state, and were negotiated and consummated between them in this state, unless it can be said that the reservation of title to the gasoline in the appellee, by the terms of the bills of lading issued by the purchasers until it was delivered at Grant's Pass, changed the transaction from a domestic one to an interstate commerce transaction.

The question is not whether the gasoline moved in interstate commerce, for there is no dispute about that. It moved from Biloxi, in this state, to a point near Grant's Pass, in Louisiana. And, under the evidence at the time the gasoline was purchased, it was intended by the purchasers for that identical interstate commerce. The question is whether or not the contract of sale and the purchase of gasoline between the appellee and the packers were an integral part of that commerce. We think the solution of this question largely turns upon the effect to be given the reservation of title to the gasoline, as set out in the bills of lading therefor issued by the boat master of the packers. It seems clear that the sales and delivery of the gasoline and payment therefor by the purchasers in this state, apart from that provision in the bills of lading, constituted purely domestic transactions, having no relation whatever to interstate commerce. In considering this question, it should be borne in mind that the bills of lading were not issued to appellee by a common carrier, but were issued by the purchasers of the gasoline themselves, the packers, or, to be more specific, by the masters of their boats, which amounted to the same thing.

The title to the gasoline was not reserved in the appellee for the purpose of securing the payment of the purchase price thereof. There is no pretense of that kind on the part of the appellee. Nor was it retained for any other purpose, so far as the record shows, unless it was a means of trying to convert purely domestic transactions into interstate commerce transactions. The packers, as stated, transported the gasoline into Louisiana by means of their own boats, which were not common carriers, and no freight was paid by either the appellee

or the packers for such transportation. Under the stipulations in the bills of lading, the packers assumed all responsibility for safe delivery of the gasoline to their fishermen, including all damage thereto in loading and unloading and transferring same, and loss by leakage in transit. What protection or security did the reservation of title to the gasoline until delivery to the consignee afford appellee? What, if anything, did appellee gain, or what could it have gained by it? We are unable to see any. Mr. Royster, the general manager of appellee, in effect, confessed, as a witness for his company, that the retention of title in the bills of lading was for the purpose of converting transactions exclusively domestic in their nature into transactions in interstate commerce.

We know of no decision of the supreme court of the United States substantially parallel in its facts to this case. But, in numerous decisions by that court, the question involved has been discussed. The solution of this question is easy, where, under the contract of sale, the shipment is delivered to a common carrier for destination in another state. It is much more difficult when the purchaser retains control of the transportation and can change his mind and divert the delivery from an interstate destination to a destination in the state where the shipment originated. The character of shipment depends evidentially on the circumstances. There must be considered what the owner has done in the way of preparation for the journey and in carrying it out. It is true that the mere power of a shipper to divert a shipment already begun does not take it out of interstate commerce, if the other facts show that the journey has already begun in good faith, nor does a temporary interruption of the passage when reasonable and in furtherance of the intended transportation. Hughes Bros. Timber Co. v. Minnesota, 272 U. S. 469, 47 S. Ct. 170, 71 L. Ed. 359; Champlain Realty Co. v. Brattleboro, 260 U. S. 364, 43 S. Ct. 146, 67 L. Ed. 309, 25 A. L. R. 1195; Railroad Co. v. Mims, 111 Miss. 574, 71 So. 827.

In Browning v. Waycross, 233 U. S. 16, 34 S. Ct. 578, 58 L. Ed. 829, the court held that the business of erecting lightning rods within the corporate limits of a municipality carried on by an agent of a nonresident manufacturer of such rods, in whose behalf the agent had solicited orders for the sale of such rods, and from whom he had received the rods when shipped into the state on such orders, may be subjected to a municipal license without violating the commerce clause of the Federal Constitution, although such contracts bound the seller, at his own expense, to attach them to the houses of the persons who ordered them. The court further held in that case that it was not "within the power of the parties by the form of their contract to convert what was exclusively a local business, subject to state control, into an interstate commerce business protected by the commerce clause."

We do not think that Unites States v. Simpson, 252 U. S. 465, 40 St. Ct. 364, 64 L. Ed. 665, 10 A. L. R. 510; United States v. Hill, 248 U. S. 420, 39 S. Ct. 143, 63 L. Ed. 337, and Kirmyer v. Kansas, 236 U. S. 568, 35 S. Ct. 419, 59 L. Ed. 721, are in point. Those cases simply hold that intoxicating liquor transported across state lines was interstate commerce, regardless of what the purpose was in so transporting the liquor. That is not the question here. The gasoline involved in this case, immediately after its purchase by the packers, moved in interstate commerce; it was purchasd with that intention. Both the seller and the purchaser knew that the gasoline was going to move across the state line into Louisiana. But, what did that have to do with the contracts of sale and the purchase? If the appellee, under the contract, had any real substantial part in the transportation of the gasoline into Louisiana, that would make them interstate commerce transactions. But, the evidence shows, beyond any doubt, that appellee had no part in the transportation. It simply delivered the gasoline to the packers in this state, who took charge of it and transported it into another state. All the appellee has to hang

to to make interstate commerce transactions out of these sales of gasoline is the stipulation in the bills of lading providing for the retention of title in appellee until the gasoline should be delivered to the consignee at Grant's Pass, Louisiana, and this stipulation stands right in the face of the undisputed fact that there was no consignee, at or near Grant's Pass. And, furthermore, as shown, the gasoline was delivered by the appellee to the packers on the wharves at Biloxi, in this state, and there the packers, by means of their boats, took charge of it and transported it to Grant's Pass for sale to their fishermen, but that they were under no enforceable obligation to appellee to do so. They were free to transport the gasoline to any other point in or out of this state. The gasoline, in other words was delivered to the consignees right here in the state, on the wharfs at Biloxi, and, therefore, the provision in the bills of lading, fixing Grant's Pass as the place of delivery, was no more than so much blank space. The packers purchased the gasoline from the appellees in this state, and paid for it. What real concern, therefore, did appellee have as to where the gasoline was to be transported, and by what means? We can see no reason whatever. The contracts of purchase and sale were complete when the gasoline was delivered on the wharves in this state. No security was demanded by, or given appellee, by the packers for payment of the purchase price. Under the provisions of the bills of lading, the entire risk of loss in transportation was assumed by the packers, and, if that had not been done, it seems that any loss in transit would have fallen on the packers, because the gasoline was being carried in their own boats.

We cannot give our assent to the proposition that the bare fact, that the appellee and the packers went through the form in the bills of lading of providing that the title to the gasoline should remain in appellee until delivered to the consignee at Grant's Pass, made the contracts of sale and purchase of the gasoline interstate commerce

transactions. We think there is little substance in that position. It is too shadowy. It is without sound reason.

It follows from these views that the suggestion of error should be sustained, and the judgment heretofore rendered in this case by this court set aside, and that this court should now render the judgment that the court below should have rendered, which is that the appellant recover of the appellee the sum of twenty-five thousand two hundred fifty-four dollars and ninety-eight cents, with six per cent. interest from November 1, 1927, representing the amount shown by the evidence to be due by the appellee to the state for the taxes sued for. Reversed and suggestion of error sustained; former judgment in this case set aside; decree of court below reversed, and decree here for appellant.

Suggestion of error sustained, and reversed, and judgment here for appellant.

**Cook** and **Ethridge, JJ.**, dissenting.

**Ethridge, J.**, delivered the dissenting opinion.

After a protracted consideration, involving the re-examination of the authorities, I am unable to concur in the views of the prevailing opinion. I could well stand upon the original opinion written herein, but there are authorities which were not commented upon in that opinion, which lend great strength to the views expressed in the original opinion.

The evidence in the case shows conclusively that the articles were purchased from the Superior Oil Company, to be sent into Louisiana. It was distinctly understood by the buyer and the seller that the articles were to be sent beyond the boundaries of Mississippi, and were not to be consumed in Mississippi. Every citizen in this state, as well as in others, has the right to engage in interstate commerce, and to procure for himself any ad-

vantages that may flow from so engaging in such commerce.

The tax here sought to be collected by the state is an excise tax, laid upon the right to exercise the business here involved. The state has no power whatever to tax this right, or to put any restrictions upon it. However, the evidence shows conclusively, I think, that the transaction was not one to evade the state law, but was one of practical necessity to the business of the appellee, the defendant below. The manager of the Superior Oil Company testified that that company was engaged in both intrastate and interstate commerce, and that the interstate commerce constituted a material portion of their business; that that company sold locally in Mississippi, and transported oil and gas to Alabama, and there resold it, but did not personally go into the state of Louisiana to do business, and had no domicile or location in that state.

Among other things, Mr. Royster, the manager, testified:

"At the time we went into this, there was one factory bought a load of one hundred barrels of gasoline, shipped from Louisiana into Biloxi, and the price was four or five cents a gallon cheaper than what we could sell for, and pay the tax. We saw it would make big inroads into our business, and in fact we could not maintain if that kept up, and we made inquiries from our attorney and I think our attorney got advice from the attorney-general that we were in our rights to ship out of the state to meet this competition. By shipping into Louisiana we met Louisiana competition.

"Q. There was competition in Louisiana? A. Yes.

". . . A. The prices fluctuate in Louisiana, and also in Mississippi. There are times when it could be bought for four cents a gallon less and times six cents less than we could sell it for with our tax.

"Q. Were people in Louisiana competing with you for this business at Grant's Pass? A. Yes.

"Q. Were they able to make deliveries at Grant's Pass. A. Yes, and were making delivery out into the marsh, would send freight boats out loaded and are doing it now and are factors in it big.

"Q. Could you have sold gasoline that was in Biloxi, except with agreement to deliver it at Grant's Pass? A. No.

"Q. Is that the understanding? A. We agreed if they gave us the whole business, we would deliver it to them according to the understanding that we had with our attorney and the attorney-general we were within the law to do that. We then agreed to keep them supplied with shipments of gasoline to Louisiana at the price, less the tax."

It will thus be seen that it was a practical necessity for the defendant to engage in interstate commerce to successfully carry on the business against competition already existing. The contract of shipment, or receipt or bill of lading—whatever it may be called—set forth in the prevailing opinion, is clearly a contract for interstate shipment of goods or property. In that contract, to make sure that the gasoline would be delivered in Louisiana, and not used or sold in the state of Mississippi, it was provided: "It is further understood and agreed that the property consigned herein remains the property of the said Superior Oil Company until it shall be delivered to consignee or consignee's agent at point of destination."

It is perfectly legitimate to so provide in the contract. One of the liberties of a citizen is the right to make necessary contracts with reference to his business, when it may be necessary or appropriate to enjoy his right or liberty. Allgeyer v. Louisiana, 165 U. S. 578, 17 S. Ct. 427, 41 L. Ed. 832.

The appellant plants itself upon the proposition that the contract was completely performed when the gasoline was delivered at the wharf to the boat owned by the purchaser of the gasoline, although the gasoline was purchased for the express purpose of being shipped into

Louisiana, and despite the fact that title was reserved in the seller until it reached that point.

In Dahnke-Walker Milling Co. v. C. T. Bondurant, 257 U. S. 282, 42 S. Ct. 106, 66 L. Ed. 239, the court expressly held that, where goods are purchased in one state for transportation to another, the purchase is interstate commerce, quite as much as the transportation. In the opinion (257 U. S. 290, 42 S. Ct. 109, 66 L. Ed. 243) the court said: "The commerce clause of the Constitution, article 1, section 8, clause 3, expressly commits to Congress and impliedly withholds from the several states the power to regulate commerce among the latter. Such commerce is not confined to transportation from one state to another, but comprehends all commercial intercourse between different states and all the component parts of that intercourse. Where goods in one state are transported into another for purposes of sale, the commerce does not end with the transportation, but embraces as well the sale of the goods after they reach their destination, and while they are in the original packages. Brown v. Maryland, 12 Wheat. 419, 446, 447, 6 L. Ed. 678, 688, 689; American Steel & Wire Co. v. Speed, 192 U. S. 500, 519, 24 S. Ct. 365, 48 L. Ed. 538, 546. On the same principle, where goods are purchased in one state for transportation to another, the commerce includes the purchase quite as much as it does the transportation. American Exp. Co. v. Iowa, 196 U. S. 133, 143, 25 S. Ct. 182, 49 L. Ed. 417, 422. This has been recognized in many decisions construing the commerce clause. Thus it was said in Welton v. Missouri, 91 U. S. 275, 280, 23 L. Ed. 347, 349: ' "Commerce" is a term of the largest import. It comprehends intercourse for the purposes of trade in any and all its forms, including the transportation, purchase, sale, and exchange of commodities.' "

In Kidd v. Pearson, 128 U. S. 1, 20, 9 S. Ct. 6, 10, 32 L. Ed. 346, 350, 2 I. C. R. 232, it was tersely said: "Buying and selling, and the transportation incidental thereto constitute commerce." In U. S. v. E. C. Knight Co., 156 U.

S: 1, 13, 15 S. Ct. 249, 254, 39 L. Ed. 325, 329, "contracts to buy, sell, or exchange goods to be transported among the several states" were declared "part of interstate trade or commerce." And in Addyston Pipe & Steel Co. v. U. S., 175 U. S. 211, 241, 20 S. Ct. 96, 107, 44 L. Ed. 136, 147, the court referred to the prior decisions as establishing that "interstate commerce consists of intercourse and traffic between the citizens or inhabitants of different states, and includes not only the transportation of persons and property and the navigation of public waters for that purpose, but also the purchase, sale and exchange of commodities." In no case has the court made any distinction between buying and selling, or between buying for transportation to another state and transporting for sale in another state. Quite to the contrary, the import of the decisions has been that, if the transportation was incidental to buying or selling, it was not material whether it came first or last.

See, also, United Fuel Gas Co. v. Hallanan, 257 U. S. 277, 42 S. Ct. 105, 66 L. Ed. 234; Eureka Pipe Line Co. v. Hallanan, 257 U. S. 265, 42 S. Ct. 101, 66 L. Ed. 227; Lemke v. Farmers' Grain Co., 258 U. S. 50, 42 S. Ct. 244, 66 L. Ed. 458; Hump Hairpin Mfg. Co. v. Emmerson, 258 U. S. 290, 42 S. Ct. 305, 66 L. Ed. 622; Shafer v. Farmers' Grain Co., 268 U. S. 189, 45 S. Ct. 481, 69 L. Ed. 909; Pa. R. Co. v. Sonman S. C. Co., 242 U. S. 120, 37 S. Ct. 46, 61 L. Ed. 189; Binderup v. Pathe Exchange, 263 U. S. 291, 44 S. Ct. 96, 68 L. Ed. 308. In the cases where the goods were f. o. b., cars at place of shipment to be sent into other states was a delivery to consignee at that place. The carrier was the agent of consignee.

It seems to me that the cases cited in the original opinion show beyond question that the instrumentality by which property is conveyed from one state to another does not make any difference, and does not change interstate transportation to intrastate transportation. In U. S. v. Simpson, 252 U. S. 465, 35 S. Ct. 364, 64 L. Ed.

665, 10 A. L. R. 510, was a case where the jurisdiction of Congress over the transaction depended upon the interstate commerce power, and the intoxicating liquor in that case was transported in the automobile of the defendant buying the intoxicating liquor for his personal use, and it was there judged to be interstate commerce.

In U. S. v. Hill, 248 U. S. 420, 39 S. Ct. 143, 63 L. Ed. 337, the liquor was carried on the person of the defendant from the state of Kentucky into the state of West Virginia, and was intended for personal use, and not for sale, and it was there held to be interstate commerce.

In the case of Kirmeyer v. Kansas, 236 U. S. 568, 35 S. Ct. 419, 59 L. Ed. 721, Kirmeyer, who lived in Leavenworth, Kan., operated a liquor business just over the river on the Missouri side, and, receiving orders from Leavenworth over the telephone, placed the liquor in his own vehicle, carried it across the river, and there delivered it, was held to be interstate commerce, and the motives were held to be immaterial in that case, although it was adjudged by the state court that the method of conducting the business was a mere sham and fraud upon the state of Kansas, to enable the defendant to carry on illegal business in the state of Kansas, in disregard of its laws prohibiting such business.

In what is known as the "white slave" cases the jurisdiction in the Federal Government over the offense depended upon the commerce clause of the Federal Constitution. By the act of June 25, 1910, 36 Stat. at Large 825, chap. 395, U. S. C. title 18, section 397, it was made a criminal offense against the Federal government to transport women or girls in interstate commerce for immoral purposes. The statute was upheld as constitutional in Hoke v. U. S., 227 U. S. 308, 33 S. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905; Athanasaw v. U. S., 227 U. S. 326, 33 S. Ct. 285, 57 L. Ed. 528, Ann. Cas. 1913E, 911; Bennett v. U. S., 227 U. S.

333, 33 S. Ct. 288, 57 L. Ed. 531; Harris v. U. S., 227 U. S. 340, 33 S. Ct. 289, 57 L. Ed. 534.

In Caminetti v. U. S., 242 U. S. 470, 37 S. Ct. 192, 61 L. Ed. 442, L. R. A. 1917F, 502, Ann. Cas. 1917B, 1168, it was held to be immaterial, in the transportation of the woman in question, that there was no expectation of pecuniary gain, and that the woman was so transported for the purpose only of being the mistress or concubine of the defendant.

See, also, authorities in the case notes to U. S. v. Simpson, in 10 A. L. R. at page 512, citing U. S. v. Burch (D. C.) 226 F. 974, where it was held that the transportation of a woman by automobile from one state to another for any unlawful purpose was interstate commerce. In this opinion, the court said: ''And the transportation of persons has long been held to be commerce. Interstate commerce then is, among other things, the passage of persons or property from one state to another. It does not necessarily, or indeed at all, involve the idea of a common carrier, or the payment of freight or fare. Interstate commerce being, therefore, in so far as applicable here, the passage of persons from one state to another, the declaration of the act, 'that any person who shall transport any woman in interstate commerce,' is equivalent to the declaration 'that any person who shall transport any woman from one state to another.' It was any transportation from state to state, for the purposes mentioned, that Congress intended to prohibit, and did prohibit, and not such transportation by common carrier alone. In these days it is just as easy to transport a woman or girl by automobile as by rail, and the former method may in many cases be much more expeditious and clandestine than the latter.''

In the case at bar there is no dispute whatever that each and all of the shipments were actually carried from Biloxi to Grant's Pass, Louisiana, in the original package, and there resold by the consignee to fishing boats operating in the Louisiana marshes. It seems to me so

clear that the transaction here involved is interstate commerce, that it is difficult to appreciate the contrary view. The only authority, as I understand the prevailing opinion, relied upon by the majority of the court, is Browning v. Waycross, 233 U. S. 16, 34 S. Ct. 578, 58 L. Ed. 829. With due deference to my learned Associates, I think that case supports my view, rather than the view of the majority of the court. At pages 19 and 20, 233 U. S., page 831, 58 L. Ed. (34 S. Ct. 579), the court said: "The general principles by which it has been so frequently determined that a state may not burden by taxation or otherwise the taking of orders in one state for goods to be shipped from another or the shipment of such goods in the channels of interstate commerce *up to and including the consummation by delivery of the goods at the point of shipment* have been so often stated as to cause them to be elementary and as to now require nothing but a mere outline of the principle." (Italics supplied.)

In that case the goods had been shipped and delivered to the purchaser, but the contract called for, in addition to the delivery of the goods at destination, that the seller would place the rods upon the building which they were purchased to serve, and the question is not whether the transportation from the buyer to the seller was interstate commerce, but whether the business of erecting the rods or attaching them to the building was a local business. The court held that it was not an interstate commerce transaction to engage in the business of putting the rods upon the building. Of course, the erecting of buildings, and the placing of fixtures on them, is not a part of interstate commerce, as it is entirely severable and separate therefrom, and becomes a business or occupation.

It seems to me that there is no case at all which supports the prevailing opinion, when the facts established by this record are considered as being in good faith. There is nothing whatever, as I see the record, that establishes, or even tends to establish, bad faith of the

parties to the contract, if that is indeed material at all. Contracts are presumed to be legal and valid, and to be entered into honestly, and for the purpose of legitimate business or uses.